UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHY GRIFFITH,

    Plaintiff,

v.

KEVIN KATTOULA et al.,

    Defendants.

_____/

Case No. 23-cv-11166

HON. MARK A. GOLDSMITH

**OPINION & ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 39)**

This matter is before the Court on Defendants Kevin Kattoula and Nic Vaiyanet's motion for summary judgment on Plaintiff Kathy Griffith's 42 U.S.C § 1983 claims of excessive force against Kattoula and failure-to-intervene against Vaiyanet (Dkt. 39).[1] For the reasons that follow, the Court (i) denies the motion with respect to Griffith's claim against Kattoula, and (ii) grants the motion with respect to her claim against Vaiyanet.

**I. BACKGROUND**

On May 22, 2020, City of Lincoln Park police officers Kattoula and Vaiyanet responded to a dispute between Griffith and her neighbors Antonio Vazquez and Kimberlee Miller at Griffith's home located at 821 Stewart Avenue, Lincoln Park, Michigan. Def. Statement of Material Facts (SOMF) ¶ 1. Griffith asserts that Vazquez and Miller approached Griffith's

---

[1] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Griffith's response to Defendants' motion (Dkt. 47), and Defendants' reply (Dkt. 48).

husband while holding screwdrivers in a threatening manner. Pl. Counterstatement of Material Facts (COMF) at PageID.639. An initial verbal argument between Griffith and Miller escalated into a fight, during which Griffith hit Miller on the head with a baseball bat. Id.; SOMF ¶¶ 4–5. Griffith maintains that she hit Miller with the bat out of self-defense and only after Miller hit Griffith in the head and ripped out Griffith's earring. COMF at PageID.639.

After speaking with neighbors to investigate the dispute, Defendants approached Griffith on her front porch. SOMF ¶ 10. Soon after Kattoula approached Griffith, Kattoula took Griffith to the ground with a "straight arm takedown," which resulted in her breaking her arm. SOMF ¶¶ 15, 23; Resp. at 2. Kattoula asserts that he took Griffith to the ground because she resisted arrest by pulling her arm away from him. SOMF ¶¶ 13–15. Griffith maintains that she was never told she was under arrest and that her resistance was her attempt to stabilize herself as her leg was giving out due to neuropathy. COMF at PageID.641.

Once on the ground, Kattoula held Griffith's arms behind her back while she was positioned with her stomach on the ground. SOMF ¶¶ 17–20. While Kattoula restrained Griffith's arms, Griffith yelled in pain and said that her right arm was broken. Vaiyanet was on the steps of the front porch during Kattoula's initial takedown and restraint of Griffith on the ground. SOMF ¶ 18.

After receiving attention from paramedics, Griffith was taken to the hospital. SOMF ¶¶ 22–23; Resp. at 2. Griffith alleges that her injuries include a broken arm and shoulder, which required surgery. Resp. at 2. Griffith filed a complaint asserting (i) a § 1983 claim against Kattoula for excessive force and (ii) a § 1983 claim against Vaiyanet for failing to intervene to prevent Kattoula's use of force. See Compl. (Dkt. 1). Defendants move for summary judgment on each

2

of Griffith's claims, arguing that they are entitled to qualified immunity. Br. Supp. Mot. for Summ. J. at 6–7.

## II. ANALYSIS[2]

To establish her § 1983 claims, Griffith must prove that Defendants, (i) acted under color of state law and (ii) deprived her of a federal right. Berger v. City of Mayfield Heights, 265 F.3d 399, 405 (6th Cir. 2001). However, "[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Stanfield v. City of Lima, 727 F. App'x 841, 845 (6th Cir. 2018) (punctuation modified). "Once raised, it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity." Id. "In this context, summary judgment is . . . appropriate unless the evidence viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." King v. City of Rockford, 97 F.4th 379, 390 (6th Cir. 2024) (punctuation modified).

Defendants assert that Kattoula and Vaiyanet are entitled to qualified immunity on Griffith's each of claims. See Br. Supp. Mot. for Summ. J. at 6–7. The Court first addresses Griffith's excessive force claim against Kattoula and next addresses Griffith's failure-to-intervene claim against Vaiyanet.

---

[2] The Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can only survive summary judgment by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

3

### A. Griffith's Excessive Force Claim Against Kattoula

Although she characterizes the entirety of the confrontation as one event, Griffith's excessive force claim comprises two distinct uses of force by Kattoula: "[i] throwing [Griffith] to the ground with bone-breaking force and [ii] continuing to pull on her arms . . . ." Resp. at 17. The Sixth Circuit, however, has cautioned against "treat[ing] all the challenged actions . . . as one ongoing use of force rather than as discrete episodes." Chaney-Snell v. Young, 98 F.4th 699, 725 (6th Cir. 2024) (emphasis omitted, punctuation modified). In other words, a "reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions." Morrison v. Bd. Of Trustees Of Green Twp., 583 F.3d 394, 401 (6th Cir. 2009). The Court thus proceeds by separately making qualified immunity determinations for the alleged takedown and arm pull.

**1. Takedown**

**a. Constitutional Violation**

"The Fourth Amendment prohibits law enforcement officers from using excessive force when making an arrest." Smith v. City of Troy, 874 F.3d 938, 943 (6th Cir. 2017). Whether the use of force is excessive in violation of the Fourth Amendment depends on whether the officer's actions were "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Wright v. City of Euclid, 962 F.3d 852, 865 (6th Cir. 2020) (punctuation modified). This inquiry is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. While the Court must ultimately look to the "totality of the circumstances," three factors—known as the Graham factors—guide this analysis: "[i] the severity of the crime at issue, [ii] whether the suspect poses an immediate threat to the safety of the officers or others, and [iii] whether he is actively

4

resisting arrest or attempting to evade arrest by flight." Id. (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). The Court addresses each factor in turn.

### i. Severity of the Crime

As the Sixth Circuit has observed, "[g]auging the severity of an offense is not always a straightforward task" and caselaw employs "various methods to determine an offense's severity." Shumate v. City of Adrian, 44 F.4th 427, 440 (6th Cir. 2022). This assessment includes whether the offense is classified as a misdemeanor or felony, as well as whether the officer involved is responding to an emergency call, and "the government's [public safety] interest in subduing a suspect." Id. at 440–442.

This factor weighs against Griffith. As to the classification of the offense, Griffith was initially charged with felonious assault with a dangerous weapon. Felony Complaint (Dkt. 17-5). That charge was later dismissed, and Griffith pled no contest to disturbing the peace. Register of Actions (Dkt. 17-6). The circumstances of Griffith's encounter with Defendants are similarly unfavorable to Griffith. Defendants arrived at the scene after a neighbor reported that Griffith hit Miller with a bat. Incident Report (Dkt. 17-2); 911 Call Audio (Ex. 3 to Pl. Resp. to Defs. Partial Mot. for Summ. J. (Dkt. 25-4)). To be sure, the parties provide differing characterizations of the confrontation between Griffith and Miller. Defendants maintain that Griffith instigated the fight with Miller, see Br. Supp. Mot. for Summ. J. at 1, while Griffith asserts that she acted in self-defense, see Resp. at 5. On the whole, however, there is sufficient evidence that Kattoula had reasonable suspicion that Griffith had engaged in an assault with a dangerous weapon. See Parsons v. City of Ann Arbor, No. 2:20-cv-10486, 2022 WL 989320, at *4 (E.D. Mich. Mar. 31, 2022) (finding that the severity factor favored the use of force where an officer had reasonable suspicion

5

that Plaintiff had committed an alleged assault). The violent nature of the crime for which Griffith was investigated weighs in Defendants' favor.[3]

### ii. Threat to Safety

Viewing the record in the light most favorable to Griffith, a jury could reasonably find that Griffith did not pose a threat to Defendants or others. By the time Kattoula used the single-arm takedown, Griffith was unarmed and outnumbered two to one by Kattoula and Vaiyainet. See Doorbell Camera Video (Dkt. 17-4). Kattoula admitted during his deposition that he did not think that Griffith would "outmuscle, outmaneuver, or outpower" him. Kattoula Dep. at 89 (Dkt. 47-5). As Kattoula acknowledged, it is his practice to bring anyone to the ground that he detects as pulling away: "I bring everyone to the ground. I go right to the ground. It's easier for me to work with, so that's what I do. If she's pulling away, she's going down to the ground." Id. From these facts, a jury could reasonably find that Griffith posed no immediate threat to the safety of Defendants or others. See Solomon v. Auburn Hills Police Dep't, 389 F.3d 167, 174 (6th Cir. 2004) (finding that a plaintiff who "bore no weapon, . . . made no verbal threats against the officers[,]" and who was not physically imposing in comparison to the officers, posed no immediate safety threat). This factor weighs in Griffith's favor.

---

[3] Griffith cites Austin v. Redford Twp. Police Dep't, 690 F.3d 490, 496–497 (6th Cir. 2012) for the proposition that "the severity of an offense alone does not render a use of force reasonable if the suspect does not pose a threat or actively resist when the force is used." Resp. at 10. In that case, the Sixth Circuit affirmed the district court's denial of the defendants' summary judgment motion on the ground that a factual dispute existed about whether the plaintiff posed a threat to officers when officers tased him while he was on the ground. Austin provides no analysis regarding the severity-of-offense factor and, therefore, offers no guidance on that factor's application in this case. Austin is unhelpful to this Court's assessment of this factor.

### iii. Resistance to Arrest or Evasion of Arrest by Flight

"[W]hen a suspect actively resists arrest, the police can use force to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." Moser v. Etowah Police Dep't, 27 F.4th 1148, 1154 (6th Cir. 2022) (punctuation modified). "Active resistance has been found where some outward manifestation—either verbal or physical—on the part of the suspect had suggested volitional and conscious defiance." Shumate, 44 F.4th at 446 (punctuation modified). A "common thread" in the Sixth Circuit's caselaw on this issue "is that noncompliance alone does not indicate active resistance." Id.

Defendants argue that Kattoula's use of force was justified because Griffith actively resisted by pulling her arm away from Kattoula even after Kattoula advised Griffith that she was under arrest. Br. Supp. Mot. for Summ. J. at 17. Griffith maintains that she was not aware that she was under arrest at the time of the takedown—and, therefore, could not have resisted what she did not know was taking place. COMF at PageID.641–642.

While Defendants point out that Griffith acknowledged that Kattoula told her she was under arrest during her May 2023 interview with law enforcement, SOMF ¶ 11 (citing 5/23/23 Interview Tr. at 11 (Dkt. 39-2)), the totality of the evidence regarding (i) Griffith's understanding of whether she was under arrest and (ii) the extent to which she resisted from Kattoula is murky at best. A doorbell-camera video that captured the incident does not depict Kattoula telling Griffith that she is under arrest. See Doorbell Camera Video. Nor does the video depict any obvious signs of struggle between Griffith and Kattoula before the takedown.

In the May 2023 interview on which Defendants rely, Griffith asserts that she was not told that she was being arrested, until the moment of the takedown:

> DETECTIVE CULTER: Well, if he told you you were under arrest and you tried to pull away, that's resisting arrest.

7

> MS. GRIFFITH: But earlier he was joking with me and he was like, I'm not going to arrest you. No. . . .
> DETECTIVE CULTER: Why did they have to pull you if they told you you were under arrest?
> MS. GRIFFITH: He didn't have to. He came and snatched me from the middle.
> DETECTIVE CULTER: But he told you you were under arrest.
> MS. GRIFFITH. But I was talking to the two cops. He ran up.
> DETECTIVE CULTER: You're not paying attention. Did he tell you you were under arrest?
> MS. GRIFFITH: Yes, he did whenever he ran up and grabbed my arm.
> DETECTIVE CULTER: And when he grabbed your arm and he told you you were under arrest --
> GRIFFITH: Then I says --
> DETECTIVE CULTER: Then what did you do?
> MS. GRIFFITH: I says, l thought you wasn't going. to arrest me. And I went to close -- he goes no, I'm arresting you and he went like that and he threw me to the ground and he did everything else.

5/23/23 Interview Tr. at 10–11. At her deposition, Griffith further asserted that she does not remember being told that she was under arrest, and initially pulled her arm away from Kattoula because she was losing her balance:

> Q. Were you resisting Officer Kattoula when he was attempting to grab your right arm and place you in the arm bar?
> . . . .
> A. Yeah, I don't remember. All's I remember is him snatching me up so quick and spinning me around and that's when I hit the ground and told him I peed my pants.
> BY MS. JOZWIAK:
> Q. Okay. Did your legs give out when he grabbed your arm?
> A. My left was giving out.
> Q. Okay.
> A. Because I have neuropathy in it.

Excerpt of Griffith Dep. at 41 (Dkt. 47-3) (objections from counsel omitted).

Notably, Griffith's telling is consistent with Kattoula's own account of the arrest. As Kattoula explained during the preliminary examination in Griffith's criminal case, he initially told Griffith that she needed to step out of her house to be assessed for injuries:

> Q: And so basically you were tricking her, correct?

> A: I wasn't tricking her. I was going to place her under arrest so I made her come out and told her I needed to look at injuries. She wasn't going to come out if I told her she was under arrest. . . .
> Q: So I'm just asking you and just being honest, an honest question with an honest answer and you lured her outside because you already seen her injuries, right?
> A: Yes, sir.
> Q : At the intent of arresting her, correct?
> A: Yes, sir.
> Q: Okay but what you didn't do was when you walked up to the window and the door, you never announced to her and request that she come outside so you can place her under arrest, correct?
> A: You're correct. I had her come out to look at her injuries.

Excerpt of Prel. Exam. Tr. at PageID.694 (Dkt. 47-6).

The above evidence shows that there is an issue of fact regarding whether Griffith knew that she was under arrest when she allegedly resisted from Kattoula and whether she pulled her arm away from Kattoula when he approached her. A jury's resolution of these factual issues will bear on the ultimate question of whether Griffith's conduct amounted to active resistance.

Resisting this conclusion, Defendants heavily rely on unpublished cases Bozung v. Rawson, 439 Fed. App'x. 513 (6th Cir. 2011) and Stanfield v. City of Lima, 727 F. App'x 841 (6th Cir. 2018) to argue that a "straight arm[-]bar takedown"—like Kattoula's takedown of Griffith—is reasonable. Br. Supp. Mot. for Summ. J. at 14, 17. The plaintiff in Bozung was an intoxicated passenger of a vehicle whose driver fled the scene after officers conducted a traffic stop. Bozung, 439 Fed. App'x. at 515–516. During the stop, Bozung had placed his hands on the side of the vehicle and had been asked by the officer to place his hands behind his back. Id. The officer executed a takedown of Bozung after Bozung repeatedly refused to comply with the officer's order to put his hands behind his back. Id. The Sixth Circuit held that the officer's takedown was reasonable given Bozung's concession that he had sufficient time—around two to three minutes—to comply with the officer's order. Id. at 519–520.

The takedown of Griffith in this case is unlike the one in Bozung. Kattoula's takedown of Griffith did not come as the result of Griffith's repeated refusals to comply. As discussed above, the takedown occurred either contemporaneously or just after Kattoula informed Griffith that she was under arrest. And while Kattoula maintains that Griffith pulled her arm back after he grabbed her, a reasonable jury could credit Griffith's position that she was not aware that she was under arrest and that she did not attempt to resist such an arrest. Excerpt of Griffith Dep. at 36, 57.

Defendants next cite Stanfield, which involved officers taking down an intoxicated plaintiff whose movements officers perceived as resistance. Stanfield, 727 F. App'x at 850. The Sixth Circuit held that officers violated Stanfield's constitutional rights by using a takedown on him; however, the officers were nonetheless subject to qualified immunity because it was not "clearly established" that such conduct was unlawful where officers could have reasonably perceived resistance from Stanfield. Id. Defendants point to Stanfield to argue that, even if Griffith did intend to resist Kattoula when she grabbed the screen-door handle, Kattoula's perception of resistance was sufficient to justify the takedown. Br. Supp. Mot. for Summ. J. at 17.

Stanfield is unhelpful to Defendants' cause. As an initial matter, and as noted above, Stanfield found that the officers' conduct in that case "was objectively unreasonable" and amounted to a violation of Stanfield's constitutional rights. Stanfield, 727 F. App'x at 848. Stanfield thus offers no support for Defendants' position that Griffith's rights were not violated here. Nor does Stanfield support the broad proposition that a jury must accept an officer's assertion that he or she reasonably perceived active resistance from an arrestee. Rather, "if the jury could reasonably conclude that from [an officer's] perspective [an arrestee] could not be seen as possibly engaged in active resistance, then qualified immunity . . . [is not] warranted." Meadows v. City of Walker, 46 F.4th 416, 424 (6th Cir. 2022). For this reason, the Sixth Circuit has rejected the

sort of broad reading of Stanfield that Defendants endorse here. See id. (holding that "Stanfield . . . does not compel reversal" of district court's denial of qualified immunity where "a reasonable juror could conclude that no reasonable officer would perceive [the plaintiff's conduct] as resisting arrest or refusing to comply"). Because a reasonable juror could conclude from the evidence that Kattoula did not perceive Griffith to be resisting arrest, Stanfield does not compel the conclusion that Griffith's constitutional rights were not violated.

### iv. Conclusion Regarding the Graham Factors

All told, the above discussion of the Graham factors shows that there is sufficient evidence for a jury to determine whether Kattoula's takedown of Griffith violated her constitutional rights. Although the first factor—severity of Griffith's suspected crime of assault with a dangerous weapon—undoubtedly cuts against Griffith, that fact may be outweighed by the jury's findings of fact with respect to the remaining two factors. Regarding the second factor—whether Griffith posed a threat to safety—there is sufficient evidence for a jury to find that Griffith did not pose a serious threat by the time officers approached her on her porch. Griffith was unarmed, and Kattoula admits that he was not physically threatened by her. Finally, there is sufficient evidence for a jury to resolve the fact question of whether Griffith actively resisted such that Kattoula's use of force was justified. Whether Kattoula's takedown was constitutionally permissible must be resolved by a jury.

### b. Clearly Established

In addition to establishing a violation to her constitutional rights, Griffith must show that the right "was clearly established at the time of the alleged violation." Wright, 962 F.3d at 864. Although Griffith "need not show [that] the very action in question has previously been held

unlawful, . . . in light of pre-existing law, the unlawfulness of the official action must be apparent." Shumate, 44 F.4th at 450.

Griffith has supplied caselaw demonstrating that, by the time of the incident in May 2022, it was clearly established that Kattoula was not permitted to use excessive force where Griffith exhibited minimal or passive resistance. Resp. at 12–13 (citing Smith v City of Troy, 874 F.3d 938 (6th Cir. 2017) and Moser v. Etowah Police Dep't, 27 F.4th 1148 (6th Cir. 2022)).

Smith involved a plaintiff who experienced a seizure while driving his vehicle. Smith v City of Troy, 874 F.3d at 941–942. After the onset of the seizure, Smith exited his vehicle and held onto a chain-link fence. Id. at 942. After Smith did not comply with to the responding officer's (Osting) requests to return to his vehicle, Osting forcibly peeled Smith's finger from the fence and took down Smith with a leg sweep. Id. A second officer then tased Smith after Smith did not comply with an order to place his hands behind his back. Id.

Before the district court, the officers successfully moved for summary judgment on Smith's excessive force claims on the grounds that they were entitled to qualified immunity. Id. Reversing the district court's grant of summary judgment, the Sixth Circuit found that there was a factual dispute as to whether Smith "actually resisted" Osting before the takedown. Id. at 945. Because a "reasonable juror could conclude that, in pulling his arm away, Smith's resistance was minimal and that Osting's response in taking Smith to the ground was excessive," the Sixth Circuit concluded that Osting was not entitled to summary judgment based on qualified immunity. Id.

In Moser, the plaintiff alleged that an officer used excessive force on her after the officer, Davis, slammed Moser on the ground, resulting in Moser fracturing her hip. Moser, 27 F.4th at 1150. The takedown occurred while another officer, Parton, attempted to arrest an individual accused of assault. Id. As Parton moved to arrest the suspect, Moser shouted that Parton had the

wrong person, touched Parton's arm, and raised her hand—which was holding her cell phone—near Parton's head. Id. Davis then stepped in and took Moser to the ground. Id.

Davis asserted that he was subject to qualified immunity from Moser's excessive force claim, arguing that Moser actively resisted by touching Parton's arm and moving her hand near his head. The Sixth Circuit rejected this argument. Relying in part on Smith, the Sixth Circuit concluded that, like the plaintiff in Smith, "[a] reasonable juror could . . . conclude that Moser offered minimal resistance when she touched Parton's arm and raised her cell phone." Id. at 1154.

Defendants challenge Griffith's reliance on Smith and Moser, arguing that neither case is applicable because, unlike Griffith, the plaintiffs in those cases were not being placed under arrest. Reply at 3–4. Defendants' attempt to distinguish Smith and Moser is unavailing.

Neither case's qualified-immunity analysis turned on whether the plaintiff was under arrest, but rather, whether a reasonable jury could conclude that the officers' use of force was excessive in light of the resistance (or lack thereof) exhibited by the plaintiffs. In Smith, the court denied summary judgment because a reasonable juror could find that the officer's use of force was excessive in light of Smith's "minimal" resistance. Smith, 874 F.3d at 945. Notably, the court relied on Shreve v. Jessamine Cnty. Fiscal Court, 453 F.3d 681, 687 (6th Cir. 2006), which held that an officer was not entitled to qualified immunity where an arrestee's "passive resistance" did not warrant the officer's use of force. Moser, in turn, relied on Smith for the proposition that "a jury must decide whether a suspect's pulling his arm away from an officer during a hand-to-hand encounter was active resistance or minimal resistance." Moser, 27 F.4th at 1154. The "key

13

question [was] . . . whether Moser actively resisted the police activity she objected to"—and not whether Moser was herself under arrest.[4] Id.

Viewing the facts in the light most favorable to Griffith, because Griffith has established that it was clearly established that Kattoula was not permitted to use excessive force where Griffith exhibited minimal or passive resistance, Kattoula is not entitled to summary judgement on the basis of qualified immunity.

### 2. Arm Pull

As with the takedown, the Court must assess whether Kattoula "had a legitimate government interest, i.e. justification, to exert force," in the form of pulling or restraining Griffith's arm. Morrison, 583 F.3d at 404. "Use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law" because "once the detainee ceases to pose a threat to the safety of the officers or others, the legitimate government interest in the application of significant force dissipates." Id. at 404–405 (punctuation modified). Importantly, there is no "de minimis injury exception to . . . [the] longstanding rule that the use of gratuitous force on an incapacitated arrestee renders a seizure unreasonable." Chaney-Snell, 98 F.4th at 716 (punctuation modified).

Defendants argue that Griffith's claim against Kattoula fails because (i) "the Ring [doorbell camera] video footage directly contradicts [Griffith's] assertions that Officer Kattoula was pulling and yanking on [Griffith's] arms after the takedown" and (ii) "[n]o reasonable juror" could find Kattoula's force as excessive "when he did not know that [Griffith's] arm was broken." Reply at 5.

---

[4] In any event, as discussed above, whether Griffith was actually aware that she was being placed under arrest such that she was resisting arrest before the takedown is a factual issue for the jury.

The Court disagrees with the conclusions Defendants draw from the video. As to Defendants' first assertion that Kattoula never pulled or yanked on Griffith's arms, the video is inconclusive. Although the video shows Griffith laying down on her stomach with Kattoula restraining her arms behind her back, view of Griffith's arm is largely obstructed by Kattoula's body. Doorbell Camera Video at 00:20–00:31. At one point, the video does show Kattoula straighten Griffith's arm, causing Griffith to yell in pain and attempt to pull her arm back closer to her body. See id. Indeed, a jury could find that the video supports Griffith's account of the severity of Kattoula's use of force. The video also cuts against Defendants' assertion that Kattoula did not know that Griffith's arm was broken. Griffith can be heard in the video yelling that her arm is broken as Kattoula grasped her arms. Id. at 00:27–00:29. Viewed in the light most favorable to Griffith, a reasonable jury could find that Kattoula used excessive force by pulling or restraining Griffith's arm after she had told him that her arm was broken.

Because issues of fact preclude the Court from determining whether Kattoula used excessive force by pulling or restraining Griffith's arm, Kattoula is not entitled to summary judgment on this element of Griffith's claim.

**B. Griffith's Failure-to-Intervene Claim Against Vaiyanet**

"Section 1983 generally prohibits a plaintiff from holding one officer liable for another's actions[,]" however, "an officer who fails to intervene to prevent another officer's excessive force can face liability for that force under § 1983." Chaney-Snell, 98 F.4th at 721. The Sixth Circuit applies a two-part test to determine whether an officer can be held liable for failing to stop excessive force: (i) the officer must have "observed the force or had a reason to know a colleague would use it" and (ii) the officer "must have had both the opportunity and the means to stop it." Id. (punctuation modified). As with Griffith's excessive force claim against Kattoula, the Court

proceeds by analyzing the subject events in segments, beginning with the takedown and next the arm pull. See Morrison, 583 F.3d at 401.

### 1. Takedown

Defendants argue that Vaiyanet is entitled to summary judgment on Griffith's failure to intervene with Kattoula's takedown because "uncontroverted video evidence shows that the takedown occurred within a matter of seconds . . . ." Br. Supp. Mot. for Summ. J. at 25. Griffith responds by arguing that "the issue of whether an officer had sufficient time to intervene or was capable of preventing the harm is a question of fact for the jury, unless, based on all evidence, a reasonable jury could not possibly conclude otherwise." Resp. at 18 (quoting Bunkley v. City of Detroit, 902 F.3d 552, 566 (6th Cir. 2018)).

While Griffith is correct that whether an officer had sufficient time to intervene is generally a fact issue for the jury to decide, the Sixth Circuit has provided guidance as to how long is long enough for an officer to have an opportunity to end the force. "At one extreme, an officer without forewarning generally will not have the ability to stop a colleague's force if the force continues for ten seconds or less." Chaney-Snell, 98 F.4th at 722 (punctuation modified, collecting cases). At the other extreme, however, "an officer generally can stop ongoing force that lasts for a minute or more." Id. (collecting cases).

Here, Kattoula's takedown of Griffith falls at the shorter end of the two extremes. Griffith has produced no evidence or argument that Vaiyanet had forewarning about Kattoula's takedown. Both the video recording and Griffith's description of the takedown show that the takedown spanned just a few seconds. Excerpt of Griffith Dep. at 41; Doorbell Camera Video at 00:01–00:03. On this record, even when viewed in the light most favorable to Griffith, Vaiyanet did not have opportunity to prevent the takedown.

16

Because Vaiyanet did not have the opportunity to stop Kattoula's takedown of Griffith, Griffith cannot demonstrate a constitutional violation stemming from Vaiynet's involvement with the takedown. Vaiyanet is entitled to qualified immunity with respect to Kattoula's takedown of Griffith.

### 2. Arm Pull

Griffith also maintains that, for at least 29 seconds, Vaiyanet wrongfully failed to prevent Kattoula from "applying continued, gratuitous, unnecessary, and excessive force" to her arms after she was taken to the ground. Resp. at 19.

Griffith compares Vaiyanet's conduct to that of the officer in Goodwin v. City of Painesville, 781 F.3d 314, 319 (6th Cir. 2015). See Resp. at 20. In that case, an officer twice tased an arrestee, David Nall, as two other officers, Hughes and Collins, stood by without intervening. Goodwin, 781 F.3d at 319. The first use of the taser, which lasted 21 seconds, brought Nall to the ground and caused him to involuntarily bring his hands near his chin. Id. After officers could not bring Nall's hands behind his back due to his convulsions, the officers again applied the taser for an additional five seconds, after which officers were able to handcuff him. Id. The Sixth Circuit affirmed the district court's denial of the officers' summary judgment motion because the prolonged 21-second tasing event presented a jury question as to whether Hughes and Collins acted reasonably in failing to take action to stop the tasing. Id. at 329

This case bears little resemblance to Goodwin. Although Griffith argues that Vaiyanet observed Kattoula's alleged excessive force for 29 seconds—i.e., from the start of the takedown to the end of the video, see Doorbell Camera Video at 00:02–00:31—the doorbell camera video shows that Vaiyanet did not know about Griffith's broken arm until the 00:19 second mark. Further, in Goodwin, the force at issue was a continuous use of a taser—i.e., the sort of "prolonged

17

application of force" that provides an opportunity for officers to intercede. Here, by contrast, Kattoula allegedly "pulled" and "yanked" on Griffith's arms. These quick, successive actions are the sort of "unexpected blows or tackles that [the Sixth Circuit] h[as] held cannot support a failure-to-intervene claim." Chaney-Snell, 98 F.4th at 723 (holding that an officer did not have the opportunity to stop another officer from twice punching the plaintiff in the face or quickly dragging the plaintiff across the doorway of a bedroom). This case is unlike Goodwin.

Because the Court finds that the evidence, viewed in the light most favorable to Griffith, does not establish that Vaiyanet had the opportunity to prevent the alleged excessive force used by Kattoula, Vaiyanet is entitled to summary judgment on Griffith's failure-to-intervene claim.

### III.  CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Defendants' motion for summary judgment (Dkt. 39). Defendants' motion is granted as to Griffith's failure-to-intervene claim against Vaiyanet. The motion is denied as to Griffith's excessive force claim against Kattoula.

SO ORDERED.

Dated: January 9, 2025          s/Mark A. Goldsmith
    Detroit, Michigan          MARK A. GOLDSMITH
                         United States District Judge